May it please the court, Gerald Claussen for the appellant and plaintiff. This case is also a federal tort claims action case and it involves the discretionary function exception. It arose in an accident that occurred in Yosemite National Park and it arose out of a project that had just been recently been involved a parking lot at a viewing area and more specifically a set of eight granite stairs that ran from the parking lot area down to a concrete path, a short concrete path that led to a number of wilderness trailheads. The discretionary function exception will not apply when a federal statute regulation or policy prescribes a course of action for an employee to follow and that's because in that case the employee has no rightful option but to adhere to the directive. The directive must be specific and mandatory. In this case the superintendent of the park issued a directive saying that this project shall comply with building codes and with ADA guidelines. Mr. Pieper who was the project manager testified that it was his job to determine whether there was compliance with the building codes, that he did an assessment and that the stairs did not he had no authority to build the stairs out of compliance with the codes and that only the superintendent, Mr. Tolleson and the accessibility coordinator Mr. Harris had that authority. What obligations does Yosemite National Park have to make any trails and viewing areas accessible under the ADA accessibility guidelines or the uniform federal accountability standards? Well as we set forth in our brief under the under the ABA, the American I think it's the American Barriers Act, they had by the terms of that act that required that the stairs be accessible. But in addition there's two different requirements here. One is that they be accessible, the second is that they comply with certain specified building codes. And whether or not the federal statute applies by its terms doesn't really matter because under the Berkovitz case and others construing the discretionary function exception, the directive does not have to be embodied in a statute, it does not have to be embodied in a regulation, it can be embodied in a policy. And here there clearly was a policy. Mr. Tolleson has had the, nobody disputes that Mr. Tolleson was the one with the authority to set the policy in this respect and he specified that that it shall comply with the building codes and with accessibility guidelines. When I was looking at some of the documents and it seemed that none of the documents contained mandatory and specific directives to which the park had no rightful option but to adhere. I'm referring to the requirements on the bid set that Piper documents show the park did make, as you said, a distinct policy choice to apply the standards of the ADAAG and UFAS, but none of the documents, at least correct me if I'm wrong, contain mandatory and specific directions to the park that the park would have to follow. Well, I do believe they did. The grant request forms stated, quote, the project will meet current safety and ADA guidelines. And there was testimony, I believe from Mr. Harris, that current safety guidelines means includes building codes. Well, but doesn't the presence of, you know, what seems to be obviously inapplicable regulations and the documents and these bid documents undercut your argument and I guess your theory that compliance with all the regulations and every aspect of the Olmstead point rehabilitation was mandatory? I don't see how that undercuts it. It seems to me it supports it. They cited specific building codes. Well, but they also cited to complying with food service regulations. Well, I understand that, but, okay, maybe I'm not, I do believe there is a semantical question that arises in this case when we say do they apply or not. Because, you know, if I say and apply, you're saying they're mandatory. I am saying they're mandatory. And so I'm just trying to figure out why we should the, for example, the California building code and most of the building codes that were specified do not by their terms apply to, would not by their terms apply to a national park. You agree? I agree with that. Okay, all right. But Mr. Tollefson said this project shall comply with these. Now the fact that there were others that don't happen to apply to this project at all because there was no food service operation, for example, if that is, if we're going to say, well, every single one of them has to apply or else none of them apply, I don't see how that. Well, then how are we picking and choosing what applies? I mean. I think that's where we get into this semantical distinction. Let me, let me put it this way. If, if I, I'm here arguing that the discretionary function exception doesn't apply. That does, I'm not saying that we don't look at the, at that exception, that we don't look at the case law construing it and that we don't go through the two-step analysis that that case law says we should go through. I'm saying that when you do that analysis, that it doesn't meet the requirements of the, the government has not met the requirements of the discretionary function exception. But if I were, if I had sued the state of California and they said that, you know, and they alleged the discretionary function exception, I would be saying that doesn't apply. I wouldn't be going through the, any of the two-step analysis. I would say it simply doesn't apply because they're a state entity. They are not the federal government. Here, it's one thing to say, for example, that let's take Mr. Harris and his analysis of the accessibility guidelines. He never said that, well, they don't apply. We don't have to meet them. He went through an analysis under one provision of those guidelines where he did an analysis and said this is not an accessible route, a term of art, under the, under these guidelines and therefore these stairs do not have to meet these guidelines because they only have to meet the guidelines if there's an accessible route. He didn't say, well, we don't have to do it because they don't apply at all. He said we don't have to put handrails on there because they don't meet the requirements. With respect, and by the way, I just want to point out that we, we argue that he, there was another provision that did apply that he didn't and where it would have met the requirements that he didn't look at. But let me get back to the building codes, a separate, separate analysis. Mr. Pieper agreed that it didn't comply. The stairs did not comply with the building codes because A, they had no handrails and B, they did not meet the rise and run requirements. He's not saying we don't even have to look at them. He did look at them. He testified that he looked at them. He said he did an assessment and they didn't comply. And Mr., the directive from Mr. Tollefson was this project shall comply with these building codes. Mr. Pieper said he did an analysis, they don't comply. We're not talking about an interpretation where it doesn't, you don't even apply here. He did that analysis and he came to the conclusion that they didn't comply. He then went on to say they decided that that was acceptable because they wanted to preserve the view and they wanted to minimize the intrusion into the terrain as far as how far the stairs extended down. But that is a policy decision where he's balancing ecological and aesthetic values against safety values. That is a policy decision but he didn't have the authority to make that policy decision. That came from his own mouth. He said he did not have that authority. He was asked who did have that authority. He said he never authorized anyone to build it out of compliance with the building codes after he had issued that directive saying it would be built in compliance with the building codes. Mr. Harris said that he had nothing to do with the building codes as opposed to the accessibility guidelines. He said he had nothing to do with the building codes and that he never authorized anybody that it could be built out of compliance with the building codes. I really think that what we have here is a situation that is very analogous to the Camasi and the Marlis bear medicine cases. And in the in those cases in the bear I believe it was the Marlis bear medicine case the contract said that the contractor would follow all safety procedures and federal law. Well they have to follow the federal tax law. Nobody's going to say that they have to follow that. They weren't any more specific in that case. But what they did have to follow was OSHA because that was a logging operation. OSHA which would not by its terms normally apply to the federal government. But the federal government who made the the contract the Bureau of Indian Affairs put in there that they did have to follow safety procedures and federal law and that they had to follow OSHA. And the government didn't didn't take any steps to enforce that. They had the power to shut down the operation for failure to follow the safety provisions under OSHA and they didn't do so. And the Ninth Circuit said in that case that was the embodiment of a policy directive. And it left the employees the government employees no discretion not to follow that. Do you want to reserve the rest of your time? I would your honor. Thank you. Good morning. May it please the court Jeff Sandberg for the United States. The plaintiffs are incorrect in their initial premise that Superintendent Tollefson ever made a specific decision that the trail steps should comply with building codes. What the record actually shows is that Superintendent Tollefson approved a general statement that the project as a whole would meet quote current safety and ADA guidelines. But when the time actually came to think about what does current safety and ADA guidelines mean? What parts of the project does it apply to? The specific decision was made to design these trail steps without a nine-inch riser and without a handrail. And that requirement became embodied in the contract that was sent out to general contractors to bid on the project. And those contract documents had been prepared by the landscape architect RHAA and had been approved by all relevant personnel at the Park Service. So you know the contract here required a nine-inch riser and did not include a handrail. So to the extent that plaintiffs are relying on the possibility that safety standards could be incorporated in a contract, well here the decision that was actually made by the Park Service was in balancing the concerns of, as my opposing colleague referenced, ecological and aesthetic considerations against the needs of safety. The decision was made that a nine-inch riser was the appropriate height. Judge Nelson you had asked whether the Americans with Disabilities Accessibility Guidelines or UFAS, Uniform Federal Accessibility Standards, would apply to their trails sort of of their own force. They would not. In fact there are draft accessibility guidelines that are being prepared for outdoor developed areas which includes trails, trailheads, viewing areas. The ADAAG and the UFAS apply to buildings and facilities. We are here talking about a trail leading from a viewing area inside of a national park as opposed to residential or commercial buildings. Let me just ask, at what point would the park's trail design become so inherently dangerous that the park would no longer be shielded from tort liability? Well the discretionary function exception applies whether or not there was a miscalculation in balancing concerns of aesthetic considerations against safety. The discretionary function exception would apply regardless. If a specific decision had been made by the Park Service that we are not going to build things that are inherently dangerous because you know there's a cliff or something and the trail leads over the cliff, that directive may be violated if you know this is then carried out in that manner. But what we need to look for in the discretionary function analysis is one, was there a specific and mandatory directive that was violated? And two, were the decisions being made susceptible to policy considerations? And I understand that a plaintiff's counsel doesn't dispute that latter prong. So we're focused really on whether there was a specific and mandatory directive. Counsel also adverted to the Camasi and Bear Medicine cases, but those are not relevant here. In both of those cases, this court explicitly assumed arguendo, the existence of discretion, at prong one. And then moved to prong two and said, is the implementation of the government's retained safety duties under a contract the kind of thing that would be shielded in this circumstance involving occupational safety? And there the court held at prong two that the again, you know, the court had, there was no dispute in those cases that there was discretion in how to implement the government's responsibilities under the contract. Mr. Clausen relies a lot on the regulations in the contracts. And I guess my question is, why put mandatory regulations in contracts if they are inapplicable to any given project? Well, the landscape architect, Doug Nelson, did testify that these were item 1.14 on which plaintiffs are relying from the very front of the bid set. That that was a boilerplate provision that appears in numerous Park Service contracts with contractors. I'm not familiar with enough with the contracting practice to know why those are included, but we do know it seems if you have to defend the United States in these types of actions, you might want to be get more familiar. It seems like it's just creating, you know, room for confusion when you have a document that says a project must comply with whatever regulation, but the official to decide doesn't think so. I mean, so. Well, so the contract here is for the benefit of the of the United States organization, the Yosemite Fund, and it contains instructions for the general contractor to follow. And so I understand the upfront regulatory requirements to be sort of establishing a baseline general principles. But then, you know, the specific design for specific elements of the project is provided later on in the contract in the part that actually calls for the specifications of the trail steps. So, you know, the specific controls the general and there's really no dispute here that the trail steps were constructed in the manner in which they were designed, which was with a nine-inch riser and and without a handrail. So at this time I'd be happy to answer any other questions or addressing. Well, let me get to the specific allegations that in the complaint here. What do you understand the plaintiff causes of action to be? He's got plaintiffs have two claims. Is that right? Or claim stated in on the basis of two different theories or what? I'm trying to remember precisely how they were articulated. I think it may have been a one count of negligence and one count for loss of consortium, but the negligence count sort of incorporated a few different theories. There had been a failure to warn theory that is has now been abandoned. It was abandoned before the district court. Well, what theories what theories do you understand are still being pursued on appeal? I think the one that's still being pursued is one for negligent design of the trail steps. Negligent design? Negligent design of the trail steps. The complaint refers to a quote confusing rise and run and refers to a failure to include handrails, guardrails, or grab bars. What are the theories besides negligent design? Well, it wasn't entirely clear in the district court what theories would be pursued. I think our motion to dismiss it. I mean on appeal. What do you understand the plaintiff is pursuing on appeal? Just the negligent design claim, your honor. All right. And the plaintiffs, I don't want to call it a defense, but the plaintiffs answer to to your discretionary immunity argument is that, well, at least on some of these issues, there was no discretion because they were mandated by law, right? Isn't that the plaintiff's position? My understanding is that they're relying on general statements made by Superintendent Tollefson rather than by any law applying of its own force. A voluntary decision had been made that for the core part of the parking lot, the Park Service voluntarily undertook to make those accessible and to meet specifications contained in certain guidelines. But the only question here is what did the Park Service decide to do? Was there a directive that was issued by senior Park Service staff to junior Park Service staff with respect to the trail steps as to how they should be designed? And what the record reflects about Superintendent Tollefson's role in the project was that he approved generally in the early conceptual stages of the rehabilitation project that the core of the project would comply with accessibility guidelines. But he specifically expected, he stated at his deposition, he did not have expertise in deciding what guidelines applied to what. And he intended that the project manager, Mr. Pieper, and the outside consultants, including the landscape architect, Mr. Nelson, would be the ones to actually decide what guidelines would apply. And then, you know, given those guidelines, what the specific requirements would be. So Superintendent Tollefson contemplated that other Park Service personnel would be exercising discretion in deciding how to design the trail steps. And there was nothing in the exercise in making those discretionary decisions. There were no laws that cabined that discretion, you know, in such a way that you could say they had no discretion to do X, you know, for instance, you know, on the dimensions of the rise and run of the risers. For instance, I mean, that, in your case, that was a discretionary decision, right? I believe that's right, Judge Tashima. There's been no statute or regulation or law that... In the sense that either a building code, ADA or something like that, doesn't mandate that they be a certain length or a certain height, at least on an outdoor stairway. That's right. We're talking about a trail inside of a national park. Building codes apply to buildings. Accessibility guidelines, UFAS and ADAG, apply to buildings and facilities. There are draft accessibility guidelines that are being prepared that do not yet have legal force that apply to trails. So the only thing that, you know, could plausibly be the source of a mandatory directive here would be a specific Park Service policy or decision to build the trail steps a particular way. And what the record reflects is that the decision that was made was to build a nine-inch riser and to not employ handrail. Your position also is there is no such on the handrail. That's right. There's no, you know, building code or anything like that that governs that construction in this outdoor area here. And that's number one. Number two, so it was within the discretion of the Park Service or its architects how to do it. And number three, Tolson did not give any specific issue, any specific policy directive as to how that was to be done. Is that your position? Those, that articulation is correct. And I would just note that the Park Service recognizes that it has discretion to implement greater safety precautions than otherwise would be required. And it was specifically considered here that a handrail could be included or that a different riser run might be used. But when those factors were considered, you know, we need the view that we're all here at Olmstead Point to see to have a handrail here. And in looking at the rise and run, they considered, you know, how steep is the slope, you know, what are the technical constraints we have on our ability to build these steps. Those considerations just illustrate that this case is sort of the textbook example of the discretionary function exception. You have government employees who are balancing policy Thank you very much. Thank you. While it may be true that the provision in the bid set did include other codes and other requirements like food service and so forth that don't apply here, I'm having a little difficulty understanding how that negates the mandatory directive with respect to those that apply. What's the mandatory directive? Is it some independent statute or code or is it the Tolleson policy? It's the Tolleson policy, which it may be, permissibly may be. Mr. Sandberg said the Superintendent Tolleson made some general comments, but he never, you know, said a specific policy that governed the project. I realize that, but I disagree and I think the project shall comply with building codes, or I'm sorry, this project shall comply with current safety and ADA guidelines. How is that not specific? How is that any less specific than the directive in the Marlowe Spare Medicine case where they said that the contractor shall comply with safety procedures and federal law? I think it's more specific than that. It's not any less specific, but the thrust seems to be that since there were in the bid set, and incidentally, what I just read is what Mr. Tolleson wrote in the grant request form, and then it was reiterated by other people from that in other documents. He said specifically, he testified that he directed his subordinates to follow this policy, and in the bid set, it said this project shall comply with, and then it listed a number of codes. I don't know who put those in there. I'm presuming that, yes, they went to some prior bid set and maybe lifted some boilerplate language, but why, there's a mere fact that, assuming it's boilerplate, and why does that make it any less effective? It specifically stated certain codes that apply here, and Mr. Pieper never said, all Mr. Pieper said, and this is the testimony the government's relying on, he was asked if he had any discussions with Mr. Nelson, the designer who's a private citizen, not a government employee, if he had any discussions with Mr. Nelson about whether the rise and run of the stairs needed to comply with any building code, and he said, I just remember we discussed it in the fact that this area was beyond our accessibility program area, and it is outside the building codes area. That's all I remember. Well, does that mean, is he saying the building codes don't apply because they're trail steps? No, he didn't say that. Mr. Nelson testified that they were told by NPS, by park people, whom he could not identify, that the building codes don't apply because it's on trail steps. It's a trail, it's on a trail, and he said we assumed it didn't apply because it was on a trail, but neither man could ever identify who said that, and Mr. Pieper never testified that he didn't believe it applied because it was on a trail. Mr. Pieper never gave that identity. So I'm having a little bit of difficulty understanding how they can get out from under the building codes. Is it your position that the building code applies to trail? Yes. Yes. Can you cite a provision in the building code that says that? I cannot cite a provision in the building code that says that, and part of the reason I think that they didn't cite any provision that it doesn't apply to trail steps, they didn't raise that part of their argument until their the court issued its opinion the very next day. The plaintiff never had any opportunity to cite any provisions to the building code because that was not an argument that had been made in the original moving papers. In the original moving papers, all they argued was they balanced the aesthetic considerations and ecological considerations against safety, and that was Mr. Pieper who said they did that. He said he and other people in the park whom he could not identify and other than he did mention the cultural staff, but he couldn't identify the people who were on the cultural staff, there's nothing in the record that identifies any of these people and that they made that decision. But then he said later that only Mr. Tollefson and only Mr. Harris had the authority to make that decision, that he expressly said he did not, and Mr. Tollefson and Mr. Harris expressly testified they did not make that decision. They did not decide that they could be built out of compliance in order to preserve the view or for any of these other reasons. Thank you. Thank you. Thank you very much for your arguments. That concludes our session. We'll be in recess. Thank you. The case is submitted.
judges: Nelson, Tashima, Murguia